UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| VALERA DJAGHOURI, Pro Se <br><br> Plaintiff, <br><br> V. <br><br> AMERICAN UNIVERSITY OF ANTIGUA, INC.; <br> MANIPAL EDUCATION AMERICAS, LLC; <br> DWAYNE HUNT; <br> DAVID T. GRAHAM; AND JOHN DOES 1-5. <br><br> Defendants. | Case No.: <br><br> CIVIL ACTION COMPLAINT <br><br> DEMAND FOR JURY TRIAL |

Plaintiff, Valera Djaghouri ("Plaintiff"), Pro Se, brings this civil action complaint against Defendants American University of Antigua Inc. ("AUA" or "Defendants") and Manipal Education Americas, LLC ("MEA" or "Defendants"), Dwayne Hunt, individually and as an officer of MEA and AUA, David T. Graham, individually and as an officer of MEA and AUA, and John Does 1-5. Plaintiff alleges the following on information and belief – except as to his own actions and facts of public record:

1. This action arises from Defendants' failure to provide reasonable accommodations for Plaintiff's disabilities, and retaliation, in violation of Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794; Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12181-12189; the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290, *et seq.*. Defendants also engaged in breach of contract, fraudulent misrepresentations, and fraudulent concealment under New York common law.

//

## I.   JURISDICTION AND VENUE

2.     At all relevant times, AUA received federal financial assistance, including through the Department of Education's William D. Ford Federal Direct Loan Program. AUA certifies student eligibility for federal loans, administers federal financial aid under Title IV of the Higher Education Act ("Title IV"), and maintains policies and procedures required by the U.S. Department of Education–including compliance with Section 504 and the ADA..

3.     Plaintiff financed AUA attendance with Title IV federal student loans.

4.     Defendants further own, lease, or operate a place of education within the meaning of 42 U.S.C. § 12181(7)(J).

5.     This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 because Plaintiff asserts claims arising under the ADA and Section 504.

6.     This Court has supplemental jurisdiction over claims for breach of contract, fraudulent misrepresentation, negligent misrepresentation, and violations of the New York State Human Rights Law, pursuant to 28 U.S.C. § 1367(a). Those claims arise from the same common nucleus of operative facts as Plaintiff's federal claims.

7.     This Court has personal jurisdiction over Defendants because they are headquartered in New York, regularly conduct business in New York, and maintain substantial administrative operations in New York.

8.     Defendant American University of Antigua is a private institution of higher education and maintains its principal place of business at 115 Broadway, New York, New York, 10006. Upon information and belief, at all times hereinafter mentioned, the defendant AUA did business as American University of Antigua and/or Manipal Education Americas.

9.      Defendant MEA, is a limited liability company with its principal place of business at 115 Broadway, New York, New York, 10006.   Upon information and belief, at all times hereinafter mentioned, Defendant MEA did business as American University of Antigua and/or Manipal Education Americas.

10.     Defendants list New York as their contact information in the World Directory of Medical Schools.

11.     Upon information and belief, MEA exercises substantial ownership and operational control over AUA, including over policies, procedures, and decisions relevant to Plaintiff's claims.

12.     Venue is proper pursuant to 28 U.S.C. § 1391(b). Defendants maintain a principal place of business in this District, and a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

## II.    PARTIES

### A. PLAINTIFF

13.     Plaintiff, Valera Djaghouri, is a resident of Los Angeles, California.

### B. INSTITUTIONAL DEFENDANTS

### a.  American University of Antigua

14.     All of Plaintiff's admissions, enrollment, tuition, and administrative appeals were directed to or handled through AUA personnel located in New York.

15.     AUA operates pursuant to authorization from the New York State Board of Regents and New York State Education Department to conduct educational activities associated with its medical program.

//

3

b. **Manipal Education Americas**

16.    Pursuant to its Articles of Organization, MEA provides "management and control of colleges, universities, and other institutions of higher education."

17.    MEA transacts business in New York: it markets, recruits, oversees admissions, enrolls, and provides administrative and educational services to AUA students and prospective students in New York, including Plaintiff.

18.    Upon information and belief, MEA and AUA (the "Institutional Defendants") have "management and control" duties that include the following responsibilities–which are at issue in this case:

a.    Ensuring that AUA complies with reporting obligations related to accepting federal financial assistance;

b.    Establishing, implementing, administering, and enforcing policies governing AUA's disability accommodations–and/or its oversight duties required that they ensure this is done appropriately by AUA staff;

c.    Hiring appropriate staff and appropriately supervising staff who are responsible for implementing disability accommodations and ensuring compliance with applicable disability laws and institutional policies;

d.    Training staff regarding disability accommodation procedures, compliance with applicable disability laws, and the implementation of accommodations;

e.    Maintaining appropriate grievance procedures and providing prompt and equitable resolution of complaints alleging disability discrimination, failure to provide

4

reasonable accommodations, or unequal treatment on the basis of disability–and/or they are responsible for ensuring that such procedures are provided at AUA;

f.      Ensuring that AUA appropriately investigates and corrects violations of applicable disability laws.

Upon information and belief, MEA exercised these responsibilities directly or through its oversight of AUA personnel.

19.    Institutional Defendants failed to perform each of its responsibilities identified in Paragraph 18(a)-(f).    Their failures to adequately perform its managerial and control responsibilities resulted in the violations of Plaintiff's rights as described herein.

## C. INDIVIDUAL DEFENDANTS

### a. Dwayne Hunt

20.    Upon information and belief, Defendant Dwayne Hunt served as AUA's Senior Associate Dean of Student Affairs at all relevant times.  In that capacity, he was responsible for reviewing, approving, and implementing disability accommodations at AUA, including as to Plaintiff's accommodations .

21.    Upon information and belief, Defendant Hunt resides and works in  Connecticut .

### b. David T. Graham

22.    Upon information and belief, Defendant David T. Graham, M.D., at all relevant times served as Executive Vice President for Academic Affairs and Provost of AUA.  Upon information and belief, Defendant Graham resides outside the State of New York and may be served at his principal place of employment at AUA.

23.     At all times relevant, Defendant Graham exercised direct operational, supervisory, and administrative authority over AUA's academic policies, accommodation practices, student disciplinary protocols and the administration of the CBSE.

**c. John Does, 1-5**

24.     Plaintiff is presently unaware of the identities of Defendants John Does 1–5. Upon information and belief, each is an employee or agent of AUA and/or MEA, who personally participated in, directed, authorized, implemented, approved, ratified or knowingly permitted one or more of the acts and omissions alleged in this Complaint.  They will be identified through discovery.

### III.    SUMMARY OF CASE

25.     This action concerns Defendants' repeated failure, after written notice and approval, to implement Plaintiff's disability accommodations—including 100% extended testing time, a private testing room, and text-to-speech assistance or a live reader—during examinations required for academic progression. AUA personnel approved and administered Plaintiff's accommodations, while MEA's registrar and administrative functions controlled examination registration, permits, student records, enrollment status, and related processing. Defendants then imposed academic and financial consequences arising from examinations and scheduling processes in which the approved accommodations were not provided.

26.     Plaintiff alleges that these failures were not isolated administrative errors, but resulted from Defendants' policies, practices, and systems governing disability accommodations, examination eligibility, academic progression, enrollment status, and financial-aid eligibility.

27.     This action also challenges Defendants' recruitment and marketing practices, which represented that Defendants provided reasonable accommodations and equal educational

access while failing to disclose material information concerning academic progression barriers, student outcomes, and the ability to provide timely accommodations to students with disabilities.

## IV.    DEFENDANTS' CORPORATE STRUCTURE AND CONTROL

28.    In or about December 2008, entities within the Manipal Education Group acquired ownership of AUA from GCLR.

29.    On or about March 19, 2012, AUA and MEA entered into a written Services Agreement ("Services Agreement") (Exhibit A) pursuant to which MEA agreed to "act as registrar for AUA programs" and to provide administrative and operational services for AUA, including admissions, student records, financial aid administration, marketing, information technology, human resources, legal compliance, public relations and other operational functions necessary to administer AUA's educational enterprise.

30.    Before and after the acquisition, representatives of the Manipal Education Group publicly announced plans to expand AUA's enrollment and campus capacity to meet demand from students seeking alternatives to limited U.S. medical school availability.

31.    Upon information and belief, the authority exercised by MEA pursuant to its organizational documents and the Services Agreement remained in effect throughout Plaintiff's enrollment at AUA and encompassed the administrative systems, personnel, and institutional functions through which the conduct alleged in this Complaint occurred.

32.    Pursuant to the Services Agreement and throughout Plaintiff's enrollment, MEA exercised operational control over administrative functions affecting students' academic progression, including registrar operations, student records, enrollment status, examination eligibility, financial aid administration, and related institutional services.

33.    AUA and MEA presented themselves to prospective and enrolled students as a unified educational enterprise and did not distinguish their respective administrative responsibilities.

34.    The Registrar's Office was responsible for student records, enrollment status, registration, examination eligibility and permits, and coordinating disability accommodation implementation, all of which directly affected students' academic progression.

35.    Defendants repeatedly acknowledged that implementation of Plaintiff's approved disability accommodations depended upon registrar processing and coordination.

36.    Upon information and belief, MEA exercised authority over these registrar functions throughout Plaintiff's enrollment and either directed, authorized, ratified, or knowingly permitted the administrative actions that delayed Plaintiff's accommodations, academic progression, and enrollment.

37.    Upon information and belief, throughout Plaintiff's enrollment, the Registrar operated from MEA's New York offices.    Plaintiff's communications regarding those matters were directed to and handled by personnel located in New York.

**A. Defendants' Business Model and Recruitment Practices**

38.    Caribbean medical schools have faced regulatory scrutiny for marketing favorable United States Medical Licensing Examination Step 1 ("USMLE Step 1") pass rates and residency placement statistics without disclosing attrition rates, academic progression barriers, and other information relevant to prospective students.    Federal regulators have brought enforcement actions against Caribbean medical schools involving alleged misrepresentations concerning educational outcomes used to recruit prospective students and obtain tuition revenue.

39. Defendants are no exception. Rather, Defendant MEA, operating from New York, created, manages, and controls the business operation, Defendant AUA. Although AUA is marketed as an independent Caribbean medical school, MEA exercises centralized authority over AUA's recruitment, admissions, registrar operations, disability accommodation process, academic administration, tuition collection, financial aid administration, marketing, and student progression policies. The challenged conduct described throughout this Complaint originated from and was implemented through this centralized management structure.

40. Public statements by MEA demonstrate that the Caribbean medical school market was viewed as a significant commercial opportunity driven by the large number of qualified United States students unable to obtain admission to domestic medical schools. MEA's business model involved recruiting students to enroll at AUA and obtaining tuition revenue, including revenue derived from federally backed educational financing.

41. During the COVID-19 pandemic, Defendants increased recruitment efforts and marketed AUA as an alternative pathway to medical education for U.S. students facing limited domestic medical school opportunities.

42. Defendants represented that they complied with ADA and Section 504 requirements and provided support to students with disabilities, while Plaintiff alleges that Defendants' actual policies and practices failed to provide timely access to examinations, academic progression, and educational benefits.

43. According to publicly available federal records, MEA received approximately $102 million in Title IV federal student aid during the 2021-2022 academic year alone, while marketing primarily to United States students, who comprised approximately sixty-four percent of AUA's student body.

44.    Despite receiving substantial federal funding and participating in programs requiring compliance with federal disability laws, MEA failed to maintain systems capable of providing disabled students meaningful access to their educational program.    Plaintiff is informed and believes that MEA's compliance issues contributed to increased federal scrutiny, including placement under the Department of Education's Heightened Cash Monitoring 2 ("HCM2") program.

45.    Through their website, promotional materials, recruitment personnel, and admissions representatives, MEA continued to market AUA as providing a holistic educational environment, compliance with disability laws, and assistance for students with disabilities.

46.    Defendants failed to disclose material facts, including CBSE progression barriers, the extent to which those policies delayed or prevented advancement to the USMLE Step 1 and graduation, student attrition, and completion outcomes, and Defendants' inability to consistently provide timely disability accommodations for high-stakes examinations.

47.    Plaintiff alleges that these representations and omissions were not incidental to MEA's business model.    Rather, they enabled MEA to recruit students, secure federally backed tuition payments, and induce students to incur substantial educational debt before those students learned of the academic barriers, progression requirements, and accommodation failures that materially affected their ability to complete the program.

**B. Plaintiff's Background and Enrollment at AUA**

48.    Plaintiff was the type of student MEA sought to recruit.    He was an aspiring physician whose educational opportunities had been disrupted by the COVID-19 pandemic, who qualified for federal student financial aid, and who reasonably relied upon Defendants'

representations concerning disability accommodations, accessible pathways to medical education, and educational outcomes in deciding to enroll at AUA.

49.     Plaintiff's pursuit of medicine was shaped by significant personal challenges. After entering foster care from five years until fourteen years of age, and overcoming obstacles, Plaintiff developed a commitment to becoming a physician and advocating for patients whose conditions are misunderstood or overlooked.

50.     Plaintiff experienced longstanding academic difficulties with timed examinations despite demonstrating strong understanding of complex scientific concepts. After an evaluation during his undergraduate studies, Plaintiff was diagnosed with Attention-Deficit/Hyperactivity Disorder, Predominantly Inattentive Presentation, and other disabilities that substantially limited major life activities, including learning, reading, concentrating, thinking, and communicating. His evaluator recommended accommodations including extended examination time and auxiliary testing supports.

51.     The diagnosis allowed Plaintiff to understand that his academic difficulties were related to disabilities and could be addressed through reasonable accommodations.

52.     Plaintiff's path to medical school was disrupted by the COVID-19 pandemic, which delayed laboratory coursework and disrupted Medical College Admission Test ("MCAT") administration.

53.     During this period, Plaintiff encountered MEA's marketing of AUA as an accessible pathway to medical education that provided meaningful support for students with disabilities, complied with federal disability laws, and achieved favorable educational outcomes. MEA represented that qualified students would receive reasonable accommodations and that

11

AUA provided successful pathways through medical education, including USMLE Step 1 and residency placement.

54.    Relying upon MEA's representations and omissions, Plaintiff enrolled at AUA and incurred substantial tuition obligations and federally backed student-loan debt.

55.    Throughout his enrollment, Defendants repeatedly approved Plaintiff's requested accommodations but failed to timely implement them for high-stakes examinations. As a result, Plaintiff experienced delays in academic progression, was required to repeat coursework, incurred additional tuition and educational debt, and suffered other consequences arising from Defendants' accommodation failures.

56.    Plaintiff complied with MEA's procedures, timely disclosed his disabilities, provided supporting documentation, communicated his accommodation needs, and pursued available internal processes. Plaintiff's delayed academic progression was not caused by a failure to comply with Defendants' requirements, but by Defendants' repeated failure to implement accommodations they had already approved.

## V.    FACTUAL BACKGROUND

### A.  Plaintiff's Enrollment and Disabilities

57.    On February 26, 2018, Dr. William C. McGunnigle, Ph.D., a licensed psychologist, diagnosed Plaintiff with Attention Deficit Disorder without hyperactivity and impulsivity, documenting significant difficulties affecting Plaintiff's ability to complete timed academic tasks and recommended reasonable accommodations .

58.    On July 23, 2020, Plaintiff submitted an AUA Registration Clearance Form as part of the admissions and enrollment process.

59.     In an email dated August 11, 2020, pursuant to Defendants' policies, Plaintiff provided Dr. McGunnigle's psychological report to Defendants through Dr. James Rice, AUA Dean and Disability Coordinator.

60.     On August 25, 2020, Defendants offered Plaintiff admission to their Doctor of Medicine program.  The admission letter, attached hereto as Exhibit B, was issued on AUA letterhead identifying "Manipal Education Americas, LLC Representative for American University of Antigua" and listing MEA's New York business address.

61.     At all relevant times, Plaintiff had documented disabilities within the meaning of the ADA and Section 504.  Before and throughout his enrollment, Plaintiff provided Defendants with supporting documentation, which Defendants acknowledged and based upon which Defendants approved accommodations.

**B. AUA's Recruitment, Admissions Representations, and Plaintiff's Reliance**

62.     In 2020, the COVID-19 pandemic substantially disrupted MCAT administration and the traditional medical school admissions process.

63.     In response to the COVID-19 pandemic, AUA temporarily waived any MCAT requirement for applicants.  AUA's published admissions policies also stated that MCAT scores were not considered in its admissions decisions.

64.     AUA also did not require applicants to possess a bachelor's degree, complete traditional pre-medical coursework, or satisfy a minimum undergraduate grade-point average, provided applicants otherwise met AUA's admissions requirements.

65.     Per AUA's website, social media, admissions materials, Student Handbook, and disability accommodation policies, the Institutional Defendants represented that AUA complied

13

with ADA and Section 504, and provided qualified students with disabilities equal access to its educational programs through reasonable accommodations.

66.     The Institutional Defendants also represented that eligible students could finance the cost of its medical program through federal student loans, allowing students to incur substantial educational obligations to attend AUA.

67.     At the time Plaintiff applied, the Institutional Defendants advertised a 91% first-time USMLE Step 1 pass rate and a 95% residency placement rate, presenting those statistics as evidence of the quality and effectiveness of AUA's medical education program.

68.     Upon information and belief, Defendants did not disclose the percentage of matriculated students who successfully passed the CBSE prerequisite required to become eligible to sit for the USMLE Step 1.

69.     Defendants' advertised USMLE Step 1 pass rate reflected only students who had successfully completed the CBSE requirement and were permitted to sit for the USMLE Step 1, rather than all matriculated students at AUA.

70.     By failing to disclose the methodology used to calculate the advertised USMLE Step 1 pass rate and the percentage of students who progressed to eligibility for the examination, Defendants materially overstated the likelihood that an entering student would achieve the advertised outcomes.

71.     Before applying to AUA, Plaintiff reviewed and relied upon Defendants' representations concerning AUA's educational outcomes, disability accommodation policies, and educational opportunities. These representations were material to Plaintiff's decision to apply, enroll, remain enrolled and incur substantial federal student-loan debt.

14

72.     Had Plaintiff known that Defendants maintained policies and practices that prevented timely implementation of approved disability accommodations, failed to disclose material academic progression barriers, and did not provide the level of access represented in their marketing materials, Plaintiff would not have enrolled at AUA.

**C. Cost of Attendance**

73.     Defendants' Doctor of Medicine curriculum consists of ten semesters completed over approximately four and one half years.

74.     Defendants charged tuition ranging from approximately $24,500 to $32,000 per semester, exclusive of housing, administrative fees, and other educational expenses.

**D. Plaintiff's Requests for and Approval of Disability Accommodations (2021-2022)**

75.     In an email dated February 17, 2021, Plaintiff requested reasonable testing accommodations for the National Board of Medical Examiners ("NBME") examinations and the USMLE Step 1 based upon Plaintiff's documented disabilities.

76.     In an email dated February 17, 2021, Defendants advised Plaintiff that Plaintiff's 2018 psychoeducational evaluation was considered outdated for purposes of obtaining NBME and USMLE Step 1 accommodations but, as a courtesy, approved one and one-half times extended testing time and a quiet, low-distraction environment for the Fall 2020 academic semester only.

77.     In an email dated February 17, 2021, Defendants, by and through Maria Murray, assistant to Dr. Rice, advised Plaintiff that Defendants would revoke previously approved testing accommodations if Plaintiff did not submit updated documentation by February 28, 2021.

78.     On August 3, 2021, Plaintiff submitted a neuropsychological evaluation prepared by Dr. Emin Gharibian, Psy.D., diagnosing Plaintiff with Attention-Deficit/Hyperactivity

Disorder ("ADHD") and Specific Learning Disorder with impairment in reading. Dr. Gharibian recommended Plaintiff receive:

(a) 100% extended testing time on all medical school exams and the USMLE Step 1;

(b) a private testing room for all examinations; and

(c) text-to-speech software and screen-reading software (or comparable assistive technology) for written work and examinations.

79.     In an email dated August 19, 2021, Defendants, by and through Dr. Urique Hall, Student Affairs Assistant, informed Plaintiff that AUA had approved double testing time and a quiet, low-distraction testing environment. Defendants did not address the text-to-speech software and screen-reading software (or a live reader) accommodation recommended by Plaintiff's neuropsychologist.

80.     In an email dated April 7, 2022, Plaintiff requested confirmation that text-to-speech-software and/or a reader would be provided.

81.     In an email dated April 20, 2022, Defendants, by and through Dr. Hall, advised Plaintiff that responsibility for examination accommodations had been transferred to Dr. Carolyn Edmondson. They ignored Plaintiff's inquiry regarding the recommended text-to-speech accommodation.

82.     However, in the same email, Defendants advised Plaintiff that no additional medical documentation would be required to support Plaintiff's accommodation requests.

*Administration of CBSE Accommodations*

83.     Because the CBSE was administered as an institutional examination purchased by Defendants, Defendants controlled the registration process and the submission of accommodation requests to NBME. NBME required examination orders to be placed no later

16

than twenty-eight days before the start of the testing window. NBME guidance further contemplated additional time to review and process requests for disability accommodations.

84. Upon information and belief, Defendants were aware that students requesting disability accommodations required additional administrative processing before examination registration could be completed, and required additional time for accommodation review, examination scheduling and related administrative processing.

85. Despite that knowledge, Defendants routinely delayed Plaintiff's registration and accommodation-related actions until close to the twenty-eight day deadline, increasing the risk that Plaintiff would experience delays in receiving approved accommodations or sitting for the examination.

86. Additionally, Defendants required students requesting disability accommodations, including Plaintiff, to comply with the same registration timelines imposed on students who did not require accommodations.

87. As a result, students requiring disability accommodations had substantially less time to complete the accommodation process before scheduled CBSE administrations, increasing the risk of academic delay.

**E. The CBSE and Defendants' Reliance on the CBSE as a Mandatory Gatekeeping Mechanism**

88. The CBSE is an examination developed by the NBME to assess a student's readiness for the USMLE Step 1 and is not itself a medical licensing exam.

89. Before the suspension of AUA's NBME privileges in May 2023, Defendants administered NBME-based examinations throughout Plaintiff's preclinical education to assess students' mastery of required coursework and readiness to progress toward the USMLE Step 1.

90. Defendants required students to achieve a specified qualifying score on the CBSE before permitting them to register for or take the USMLE Step 1.

91. Pursuant to Defendants' Student Handbook, students were scheduled to take the CBSE upon completion of the fifth semester of the preclinical curriculum.

92. As a result of Defendants' policies, a student's inability to take or pass the CBSE – including as a result of delayed, denied, or inadequate disability accommodations – could delay or prevent a student's progression to the USMLE Step 1 examination, clinical rotations, graduation, continued eligibility for Title IV federal student aid, and other academic milestones.

93. Upon information and belief, Defendants used the CBSE as a mandatory progression requirement that determined whether students could continue toward the USMLE Step 1, clinical training, and graduation. Students who failed to achieve the required score were prohibited from advancing in the curriculum and were required to remain enrolled, incurring additional tuition, fees, and other educational expenses before being permitted to attempt the examination again.

## F.  Defendants' Loss of Authorization to Administer the CBSE

94. Upon information and belief, Defendants became aware of the NBME investigation into examination security before the revocation of AUA's authorization to administer the CBSE through Prometric.

95. Defendants did not notify students of the pending investigation or the risk that AUA could lose authorization to administer the CBSE until after that authorization had been revoked.

96. In an email dated May 22, 2023, Defendants, by and through Defendant Graham, advised students that they lost authorization to administer the CBSE through Prometric. Defendants acknowledged that the decision would "cause significant disruptions" to students.

97. On May 9, 2023, MEA, by and through the Registrar, confirmed that Plaintiff had been registered to take the CBSE at a Prometric Testing Center during the June 1 through June 14, 2023 testing window with approved testing accommodations.

98. In an email dated May 25, 2023, Defendant Graham informed the student body, cc-ing Craig Hauser and Dr. Peter Bell, that NBME had suspended AUA's authorization to administer the CBSE and that AUA would immediately replace those examinations with internally administered "NBME-style" Kaplan ("Kaplan") examinations consisting of questions obtained from commercial test-preparation companies and questions developed by AUA faculty.

99. As a result, Plaintiff was unable to sit for the already-approved and scheduled CBSE during the June 2023 testing window. Instead, Plaintiff was required to take the internally administered Kaplan examination.

100. Upon information and belief, the suspension of AUA's authorization to administer official NBME examinations affected students' progression through AUA's curriculum and required AUA to implement substitute examination procedures.

101. On June 8, 2023, following the NBME's suspension of AUA's authorization to administer the CBSE and amid widespread disruption, Defendants reduced the qualifying passing score for the Kaplan examination from 68% to 65%.

//

//

//

19

### G. CBSE and Examination Events (2023)

#### a. June 14, 2023 Kaplan test

102. Defendants represented that Plaintiff's previously approved testing accommodations would apply to the June 2023 Kaplan examination, including administration of the examination over two separate testing days, with approximately one-half of the examination administered each day.

103. Instead of administering the examination over two separate testing days, Defendants required Plaintiff to complete the examination during a single seventeen-hour testing window beginning at approximately 8:00 am Pacific Time and ending at approximately 1:00 a.m. Pacific Time.

104. The seventeen-hour testing window required Plaintiff to remain cognitively engaged for substantially longer than medically recommended and differed materially from the two-day accommodation previously approved by Defendants.

105. On June 14, 2023, Plaintiff took the Kaplan test on Defendants' Kaplan Exam software. Upon beginning the exam, Plaintiff learned that Defendants would not provide the previously approved two-day testing accommodation.

106. Additionally, Defendants' Kaplan Exam software did not include Plaintiff's previously approved text-to-speech or screen-reading functionality.

107. Plaintiff received a score of 61% on the June 2023 Kaplan examination.

108. Plaintiff's score was adversely affected by Defendants' failure to provide the approved accommodations of text-to-speech software and two-day testing.

109. On June 22, 2023, Plaintiff emailed Defendants through Dr. Neville Fernandez, Director of the Exam Center, reporting the technical problems encountered during the

examination and advising that Defendants had failed to provide Plaintiff's approved testing accommodations, including text-to-speech software and administration of the examination over two separate testing days.

110.    In an email dated June 22, 2023, Defendants, by and through Dr. Fernandez, responded that he did not believe anything further could be done.

111.    At all times relevant, Dr. Fernandez served as Director of the Exam Center and Campus Chief Proctor and was responsible for overseeing the administration and integrity of examinations.

112.    Despite Plaintiff's contemporaneous report that the June 2023 Kaplan examination had been administered without approved accommodations and had been affected by significant technical problems, Defendants did not suspend the Promotions Committee's decision, investigate the administration of the examination before imposing academic consequences, or provide Plaintiff with an opportunity to retake the examination with the previously approved accommodations.

113.    In an email dated June 26, 2023, Defendants, by and through Defendant Hunt, Senior Associate Dean of Student Affairs, confirmed that Plaintiff's approved accommodations for the Kaplan examination included 100% extended testing time and a reader or equivalent text-to-speech assistance, stating, "*Your accommodations support 100% more testing taking time and a reader on your device.*"

114.    On June 28, 2023, Plaintiff emailed Dr. Dwayne Hunt explaining that his approved disability accommodations, including text-to-speech software and a two-day exam period, had not been provided during the June 14 Kaplan examination.

115. In an email dated June 28, 2023, Defendant Hunt, indicated that Defendants "do not offer preclinical exams over days while at home or onsite".

116. In an email dated July 6, 2023, Defendant Graham ignored Plaintiff's missing accommodations and asserted that Plaintiff had received his approved accommodations during the June 2023 Kaplan examination. However, Defendant Graham also admitted, "Kaplan did promise a two day exam which did not happen."

117. In the same email, Defendant Graham advised Plaintiff that, because the promised two-day Kaplan examination had not occurred, Plaintiff would not be required to repeat the BSIC course before taking the replacement Kaplan examination scheduled for October 2023.

118. As a result of Defendants' failure to provide approved testing accommodations during the June 2023 Kaplan examination, Plaintiff's academic progress was delayed and he also did not receive the benefit of a lowered passing threshold given to students who took the examination with the intended testing conditions.

119. On July 7, 2023, Defendant Graham informed Plaintiff that he would receive a failing grade ("F") for the June 2023 Kaplan examination, where Defendants failed to provide approved accommodations.

120. Defendants further advised Plaintiff that they would not consider Plaintiff's complaints regarding the June 2023 examination or any request to change the failing grade unless and until Plaintiff passed the October 2023 Kaplan examination.

121. Rather than voiding the June 2023 examination or promptly readministering it with Plaintiff's approved accommodations, Defendants delayed Plaintiff's academic progress and required him to overcome Defendants' failures by passing a subsequent qualifying examination.

122.    As a result, Plaintiff remained subject to a failing grade from the June 2023 examination, lost the opportunity to benefit from the reduced 65% qualifying score, experienced academic delay, became ineligible for additional Title IV federal student aid, lost his in-school loan deferment, and became subject to repayment obligations and accruing interest on approximately $230,000 in federal student-loan debt.

**b.  October 2023 Replacement Kaplan Examination**

123.    On September 13, 2023, Defendants advised Plaintiff that the October 2023 replacement Kaplan examination would be administered at Kaplan testing centers in New York or onsite in Antigua.

124.    On September 22, 2023, Defendants requested that Plaintiff indicate whether he intended to take the examination in New York or Antigua and instructed Plaintiff to respond by September 23, 2023.

125.    On September 30, 2023, Defendants advised Plaintiff that Plaintiff's previously approved accommodations would not be provided for the October 2023 replacement Kaplan examination in New York.  Defendants attributed the denial of Plaintiff's accommodations to Kaplan, stating, "Regrettably, we have received a response from Kaplan, and they have declined the provision for extra time accommodation for the upcoming exams."

126.    Upon information and belief, Defendants, not Kaplan, were the official administrators of the October Kaplan examination and determined which disability accommodations would be authorized and implemented for Plaintiff.

127.    Upon information and belief, Defendants did not authorize Kaplan to provide Plaintiff's approved accommodations for the replacement examination.

128. Upon information and belief, Kaplan testing centers in New York are capable of administering disability accommodations when authorized by the sponsoring examination program.

129. Rather than providing Plaintiff with the approved accommodations for the October 2023 replacement Kaplan examination, Defendants advised Plaintiff that he could: (1) take the examination in New York without his previously approved accommodations; (2) travel to Antigua to take the examination with those accommodations; or (3) defer the examination until December 2023.

130. Defendants advised Plaintiff that they would not reimburse the costs associated with traveling to Antigua to obtain the previously approved accommodations.

131. Non-disabled students could take the October 2023 Kaplan examination in New York without incurring additional travel expenses, whereas Plaintiff could test with approved accommodations only by traveling to Antigua at his own expense.

132. As a result of Defendants' refusal to provide Plaintiff's previously approved accommodations in New York, Plaintiff did not take the October 2023 replacement Kaplan examination, delaying his academic progress and deeming him ineligible to take the USMLE Step 1.

**H. Plaintiff's Efforts to Timely Obtain USMLE Step 1 Accommodations (2023)**

133. While attempting to satisfy Defendants' prerequisites for taking the USMLE Step 1, Plaintiff also attempted to timely initiate the separate USMLE disability accommodation process.

134. Before seeking to register for the USMLE Step 1, Plaintiff reviewed published USMLE guidance concerning disability accommodations, which advised applicants to submit

accommodation requests well in advance of the intended examination date because review of new accommodation requests could require approximately 60 business days, with additional time required in certain circumstances.

135. Accordingly, Plaintiff contacted USMLE Disability Services to begin the accommodation process for the USMLE Step 1.

136. Defendants' Student Handbook required students to take the USMLE Step 1 within three months after passing the CBSE.

137. USMLE Disability Services informed Plaintiff that it could not process his accommodation request until Defendants verified Plaintiff's status as an AUA student.

138. On October 5, 2023, Plaintiff requested that Defendants provide the required verification.

139. On October 9, 2023, in an email from Dr. Hall, Defendants advised Plaintiff that per Defendants' policies, Defendants would not verify Plaintiff's status for purposes of the USMLE Step 1 disability accommodation process until Plaintiff passed the CBSE.

140. As a result, Plaintiff could not begin the USMLE accommodation-review process, as suggested by USMLE, before passing the CBSE.

141. Upon information and belief, Defendants were aware that their policy of withholding student-status verification until after a student passed the CBSE could delay the processing of USMLE Step 1 accommodation process.

**I. Later Examination Events (2023-2025)**

**a. December 2023 Kaplan Examination**

142. On November 21, 2023, Defendants, by and through Namrata Chabra, Associate Dean of Academic Affairs, advised students that Defendants had not regained authorization to

administer NBME examinations and that the December 2023 Kaplan examination in New York had been cancelled, further delaying academic progress.

143.    Defendants further advised students that they could either travel to Antigua to take the December 2023 examination or defer the examination until May 2024.

### b.    CBSE Registration Process and Plaintiff's Accommodation Requests

#### i.    General Registration Process (nondisabled students)

144.    To register for the CBSE, all students must register and pay for the examination with the Registrar.    Upon communication of the student's intent to register for the CBSE, Defendants, by and through the Registrar provides said student with a two-week testing window.

145.    Upon communication of the student's intent to register, NBME will send a scheduling permit to said student within 5-10 business days.

146.    Unlike students who did not require disability accommodations, Plaintiff was advised by the Registrar that "[b]ecause [he has] special accommodation, [his] permit [took] a little longer than normal to process" as reflected in Defendants' emails dated May 9, 2023, December 1, 2023, April 18, 2024, and August 15, 2024.

147.    Defendants did not explain what they meant by "a little longer than normal" or how much additional time students requiring accommodations should expect.

148.    Upon receiving their scheduling permits, nondisabled students schedule their examinations for their preferred dates and locations on the Prometric website.    Nondisabled students then immediately receive an email from NBME confirming their appointment confirmations and take this email to the testing center the date of the exam.

//

//

## ii.    Registration Process for Students with Accommodations

149.    Contrarily, because Plaintiff needed special accommodation(s), specifically extended time that exceeded regular business hours for Prometric test centers, he could not schedule his CBSE on the Prometric website.

150.    Instead, Plaintiff was required to call the Prometric testing center to schedule his exam, as instructed by Defendants in the aforementioned emails dated May 9, 2023, December 1, 2023, April 18, 2024, and August 15, 2024.

151.    As a result, unlike nondisabled students, Plaintiff's ability to obtain a testing appointment depended upon additional administrative processing by Defendants and coordination with Prometric, making Plaintiff substantially more vulnerable to delays in registration and examination scheduling.

152.    Defendants did not identify which Prometric testing center Plaintiff should contact to schedule his accommodated examination.

153.    Upon information and belief, there were approximately twenty-one Prometric testing centers in California, including approximately eleven in Southern California, where Plaintiff resided.

154.    Defendants did not provide guidance to Plaintiff regarding the procedures for obtaining an accommodated testing appointment through Prometric and also did not contact Prometric to assist Plaintiff in obtaining accommodations for the CBSE.

155.    After contacting the Prometric call center, Plaintiff learned that he could not schedule an accommodated examination simply by calling the center, contrary to Defendants' instructions.

156.   Instead, the Prometric call center had to contact an individual testing center to determine whether that location could extend its operating hours to administer Plaintiff's approved accommodation of 100% extended testing time.

157.   The Prometric call center could submit the request to only one testing center at a time. It did not copy Plaintiff on those communications nor otherwise provide him with updates regarding the status of the request.

158.   If a testing center declined the request, the matter had to be closed before the Prometric call center could contact another testing center and repeat the process.

159.   As a result, unlike nondisabled students, Plaintiff could not independently schedule his examination upon receiving his scheduling permit and instead depended upon coordination among Defendants, Prometric, and individual testing centers, creating additional delays and uncertainty that did not apply to nondisabled students.

160.   Because Defendants did not identify an appropriate Prometric testing center nor assist Plaintiff with scheduling an accommodated examination, Plaintiff contacted individual Prometric testing centers himself to locate a facility capable of administering the CBSE with his approved accommodations.

161.   After locating a testing center willing to extend its operating hours to administer Plaintiff's approved accommodations, Plaintiff notified the Prometric call center so that Prometric could independently verify the testing center's availability.

162.   The Prometric call center would not provide Plaintiff with a timeframe for completing that verification, would not notify Plaintiff when it contacted the testing center, and would not include Plaintiff in those communications.

163. Plaintiff therefore had to repeatedly contact the Prometric call center to determine the status of his accommodation request and scheduling process.

164. On multiple occasions, the information provided by the Prometric call center concerning its communications with testing centers proved inaccurate or incomplete, further delaying Plaintiff's ability to schedule the examination.

165. Only after Prometric confirmed that a testing center could administer the examination with Plaintiff's approved accommodations was Plaintiff permitted to schedule the CBSE and receive an appointment confirmation identifying the examination date, testing location, and approved accommodations.

166. Plaintiff then notified Defendants that his accommodated examination had been scheduled and repeatedly requested confirmation that all approved accommodations would be implemented during the examination.

167. Defendants did not provide Plaintiff with confirmation that all approved accommodations would be provided and also did not consistently acknowledge receipt of Plaintiff's appointment-confirmation emails.

168. Defendants' Disability Support Services did not assist Plaintiff in identifying an appropriate testing center, communicating with Prometric, confirming the implementation of Plaintiff's approved accommodations, nor otherwise facilitating the accommodated registration process.

169. As a result, Plaintiff was required to devote substantial time and effort ensuring that he would have access to the CBSE with accommodations.

170. Upon information and belief, Defendants' registration procedures failed to account for the additional administrative steps and delays associated with scheduling

accommodated examinations, resulting in Plaintiff having less time and fewer scheduling options than students who did not require accommodations.

## J. Repeated Failures to Provide Approved Accommodations

### a. Continued Failures During the January 5, 2024 CBSE

171.    On December 1, 2023, MEA, by and through its Registrar, confirmed that Plaintiff was registered for the January 5, 2024 administration of the CBSE with his previously approved accommodations.

172.    Consistent with Defendants' prior practices, Plaintiff again was required to devote substantial time coordinating with Prometric, individual testing centers, and Defendants in an effort to schedule the CBSE with approved accommodations.

173.    After navigating the registration process described above, Plaintiff appeared for the January 5, 2024 administration of the CBSE but became ill during the examination.

### b. January 26, 2024 CBSE and Renewed Denial of Approved Accommodations

174.    On January 11, 2024, Defendants authorized Plaintiff to retake the January 5, 2024 CBSE during a replacement testing window running from January 15 through January 28, 2024.

175.    On January 14, 2024, a new permit for the CBSE was issued.    The permit, based on information received from Defendants, did not include Plaintiff's approved accommodation of text-to-speech software, or alternatively, a live reader.

176.    On January 22, 2024, Plaintiff advised Defendants that the accommodation of text-to-speech and/or a live reader was still missing on his CBSE permit, citing his previously submitted medical documentation wherein his neuropsychologist requested he "should be permitted to use either speech-to-text software or a dictation service…"

177.    In an email dated January 25, 2024, by and through their registrar, Defendants refused to add Plaintiff's previously approved accommodations to the replacement CBSE permit, stating that "any accommodations granted at this time will be in effect for future exams. The testing window has already locked."

178.    In an email dated January 25, 2024, Defendants, by and through Urique Hall, asserted that Plaintiff historically had been approved only for extended testing time and further represented that Plaintiff's student file did not contain the neuropsychological documentation recommending a reader or text-to-speech accommodation.

179.    Additionally, in an email dated January 26, 2024, Defendants, by and through Defendant Hunt, required Plaintiff to submit additional medical documentation to obtain the accommodations despite Defendant Hunt's previously acknowledging that Plaintiff's accommodations included "100% more testing taking time and a reader on your device."

180.    Defendants' request that Plaintiff submit additional medical documentation contradicted their prior representation that Plaintiff would not be required to provide further documentation to receive his medically recommended accommodations.

181.    Defendants further advised Plaintiff that if he did not sit for the January 26, 2024 CBSE, he would face academic consequences, including a failing grade, continued ineligibility for Title IV federal student aid, repetition of the BSIC course at additional tuition expense, and further delays in his academic progression.

182.    Faced with those consequences, Plaintiff sat for the January 26, 2024 administration of the CBSE without all of his previously approved accommodations.

183.   Plaintiff achieved a score of 66 on the January 26, 2024 CBSE.  According to the resulting NBME score report, that score corresponded to an approximately 97% probability of passing the USMLE Step 1.

184.   Despite Plaintiff's performance on the January 26, 2024 CBSE without full accommodations, Defendants continued to treat Plaintiff as having failed to satisfy Defendants' internal progression requirements.

185.   Plaintiff thereafter requested that Defendants equitably resolve their failure to provide his approved accommodations by applying the same 65% passing threshold that Defendants had adopted for the June 2023 Kaplan examination, during which Plaintiff likewise had not received all approved accommodations.

186.   On January 30, 2024, Defendants denied Plaintiff's request and instead advised Plaintiff that he could repeat the BSIC course at an additional cost of approximately $25,000, while remaining ineligible for Title IV federal student aid.

### c.   Defendants' Continued Denial and Shifting Explanations

187.   In an email dated January 31, 2024, Defendants, by and through Defendant Hunt, questioned Plaintiff's need for accommodations, stating, "This report was written in 2021, before starting med school.  If you had needed a speech to text before.  What has changed?"

188.   In an email dated February 6, 2024, Defendants, by and through Defendant Hunt, claimed Plaintiff has not been diagnosed with dyslexia

189.   In an email dated February 7, 2024, Defendants, by and through Defendant Hunt, requested to speak with Plaintiff's neuropsychologist to confirm Plaintiff's previously submitted medical diagnoses.

190. On February 13, 2024, after questioning Plaintiff's diagnoses and requesting to speak directly with Plaintiff's neuropsychologist, Defendant Hunt acknowledged that Plaintiff was entitled to text-to-speech software or a live reader as accommodations for Plaintiff's disability.

191. Despite acknowledging that Plaintiff was entitled to those accommodations, Defendants nevertheless upheld Plaintiff's failing grade and required Plaintiff to repeat the BSIC course.

192. In an email dated February 20, 2024, Defendants, by and through Defendant Hunt, denied that Defendants were responsible for Plaintiff's inability to receive the requested accommodations during the preceding year. Defendant Hunt further took the position that Plaintiff's repeated requests for accommodations did not establish that Defendants had provided inappropriate or incomplete accommodations.

193. Defendant Hunt further asserted that Plaintiff had not previously communicated his request for text-to-speech or reader accommodations to Defendants and suggested that Plaintiff's prior academic performance undermined the need for those accommodations. Specifically, Defendant Hunt stated, "[Plaintiff was] successful on exams prior to the CBSE, so any adjustments should have been requested by [Plaintiff] as we would not know of [his] challenges without [him] raising them."

194. In an email dated February 26 2024, Defendant Graham stated, based on Defendant Hunt's information, that Plaintiff had not previously requested a text-to-voice reader (text-to-speech) accommodation.

195. In an email dated February 27, 2024, Plaintiff provided Defendant Graham with previous emails as proof of prior disability accommodation acknowledgments and multiple requests for accommodations.

196. In an email dated March 1, 2024, Defendant Hunt acknowledged his mistake in failing to provide text-to-speech accommodations, admitting that Plaintiff had requested assistive technology in June 2023 and that a July 6, 2021 neuropsychological report had recommended it.

197. However, in the same email, Defendant Hunt claimed that Plaintiff was aware that "all exams administered through AUA were taken without this technology."

198. MEA's Student Handbook states that Defendants have the responsibility to "provide or arrange auxiliary aids and services for students with disabilities." Upon information and belief, Defendants' policy or practice of administering examinations without requested assistive technology was inconsistent with Defendants' obligations under the ADA, Section 504, and Defendants' Student Handbook.

199. At no time did Defendants advise Plaintiff that his requested text-to-speech software or reader constituted an unreasonable accommodation or that the accommodation had been denied on that basis.

200. In an email dated March 4, 2024, Defendants, by and through Dr. Hall, confirmed that Plaintiff's requested accommodations, including text-to-speech software, had been approved for future examinations.

### d. May 2024 CBSE: Approved Accommodations Again Not Implemented

201. In an email dated March 18, 2024, Defendants, by and through Defendant Graham, ordered a new CBSE for Plaintiff in April of 2024, approximately one (1) year after the completion of Plaintiff's fifth semester, as agreed upon in enrollment contracts.

34

202.    In an email dated April 18, 2024, Defendants, by and through the Registrar, confirmed Plaintiff's May 14–27, 2024 CBSE window. In the same email dated April 18, 2024, Defendants confirmed Plaintiff would receive "extended time, private room, and Text-to-Speech allowance."

203.    After receiving Defendants' assurance that text-to-speech would be provided, Plaintiff contacted NBME to determine how the accommodation would be implemented at Prometric testing centers.

204.    In an email dated April 30, 2024, NBME advised Plaintiff that certain text-to-speech software programs could be used at the examinee's own risk and further advised that, alternatively, a reader could be provided upon the sponsoring institution's approval.

205.    Defendants did not advise Plaintiff that use of the software "at the examinee's own risk" could jeopardize Plaintiff's ability to take future NBME examinations, nor did Defendants authorize the reader accommodation identified by NBME as an available alternative.

206.    In an email dated May 20, 2024, Plaintiff advised Defendants that his Prometric permit listed only double time and a separate room, and did not include the text-to-speech and/or reader accommodation discussed with Defendant Hunt.

207.    In an email dated May 23, 2024, Defendants by and through Defendant Hunt advised Plaintiff that he could either take the examination without the approved accommodations or decline to take the examination and "subject [himself] to the appeals decisions … the responsibility for this choice is yours." In the same email, Defendant Hunt advised Plaintiff that use of the text-to-speech software accommodation will be at Plaintiff's own risk. Additionally, Defendants, by and through Defendant Hunt, did not offer a reader option as suggested by NBME.

35

208. In an email dated May 23, 2024, 14 minutes after Defendant Hunt's email to Plaintiff, Plaintiff clarified to Defendant Hunt that Prometric testing centers do not allow text-to-speech or a reader unless the permit expressly reflected those accommodations. Additionally, Plaintiff reminded Defendant Hunt that the permit did not include the reasonable accommodation of text-to-speech software and/or a reader.

209. After Plaintiff raised the urgent accommodations issue, Defendant Hunt became unavailable until after the May 27, 2024 testing window closed. Defendants did not resolve the reader and/or text-to-speech issue before the May CBSE window ended. As a result, Plaintiff was unable to take the May 2024 CBSE with the approved accommodations.

**e. June 2024 CBSE and Continued Failure to Implement Approved Accommodations**

210. Because Defendants failed to provide Plaintiff's approved text-to-speech accommodation during the May 2024 CBSE testing window, Defendants rescheduled Plaintiff's CBSE for June 2024.

211. In an email dated June 4, 2024, Defendant Hunt advised Plaintiff that, if Plaintiff took the CBSE at Prometric, Plaintiff would have to forgo the approved text-to-speech accommodation.

212. Plaintiff responded that a live reader was the practical alternative for implementing his approved accommodation.

213. In an email dated June 4, 2024, Defendant Hunt responded that Plaintiff had previously declined a reader accommodation.

214. Plaintiff had previously expressed only a preference for text-to-speech software over a reader due to his ADHD symptoms.

36

215.    In an email dated June 10, 2024, Defendants, by and through Defendant Hunt, denied the accommodation of a reader, claiming Defendants did not have sufficient time to modify Plaintiff's accommodations to include a reader.

216.    In an email dated June 11, 2024, rather than arranging for a reader accommodation, Defendants advised Plaintiff that he could either: (1) travel to Antigua to take the CBSE with his approved accommodations; or (2) take the CBSE at a Prometric testing center without text-to-speech accommodation and without a reader.

217.    Upon information and belief, nondisabled students were not required to travel to Antigua to receive equivalent access to the CBSE.

218.    In an email dated June 12, 2024, Defendants by and through Defendant Graham, attributed the denial of Plaintiff's accommodation to Plaintiff, stating, "[y]ou reached out on May 24th, indicating that text-to-speech was unavailable on your permit, leaving Dr. Hunt no time to address the issue."

219.    Plaintiff responded that Defendants' response concerning his accommodations was not received until after the application deadline, making it impossible to obtain the requested accommodation before the examination.

220.    On June 12, 2024, because Plaintiff could not afford to travel to Antigua, Plaintiff advised Defendants that he would have to take the June 2024 CBSE at a Prometric testing center without his previously approved accommodations.

221.    In an email dated June 18, 2024, Defendant Graham stated that Defendants had assumed Prometric would permit the requested assistive technology.

//

//

**f. July 2024 CBSE: Continued Failures to Provide Meaningful Access**

222. On June 18, 2024, Defendants issued Plaintiff a CBSE permit for the July 11 through July 24, 2024 testing window. The permit reflected Plaintiff's approved accommodations, including a reader, private room, and 100% extended time.

223. Defendants selected a three-week testing window for the July 2024 CBSE despite knowing that students requiring disability accommodations often experienced additional delays obtaining scheduling permits, confirming approved accommodations, and locating testing centers capable of administering those accommodations.

224. Although a three-week window generally allowed nondisabled students sufficient time to schedule a CBSE appointment through Prometric, Plaintiff was unable to secure a Prometric testing center capable of administering the examination with his approved accommodations within that period.

225. In an email dated July 22, 2024, Plaintiff advised Defendants of the frustrations he faced in finding a Prometric center capable of implementing his reasonable accommodation of extended time. Plaintiff reminded Defendants that USMLE splits exams into two days for any disability accommodation requiring 1.25 times or greater. Prometric can accommodate a two-day exam, if the permit so reflects.

226. In an email dated July 24, 2024, Defendants rejected Plaintiff's and Prometric's suggestion for a two-day exam. By and through Ricardo Hood, MD, Defendants stated, "The two-day CBSE exam mentioned can only be delivered on campus per our guidance from the NBME. ... It appears that you have exhausted all options and now will be required to retake BSIS." Defendants declined to authorize a comparable two-day administration at a Prometric testing center as requested by Plaintiff and supported by Prometric.

227. As a result, Defendants advised Plaintiff that he would be required to repeat the BSIS course at an additional cost of approximately $25,000.

228. In an email dated July 24, 2024, Plaintiff reminded Dr. Hood of the frustrations Plaintiff faced in obtaining access to the CBSE with full reasonable accommodations, stating, "[his] accommodations have only been accurately represented in the past month, following nearly a year and half of delays....the narrow time frame and the difficulty in finding a center that meets [his] updated accommodations."

229. In the same email dated July 24, 2024, Plaintiff advised Defendants that requiring him to spend approximately $25,000 to repeat the BSIS course was discriminatory and inequitable because it punished him for being unable to locate a Prometric testing center capable of providing his approved accommodations within the limited testing window.

230. Defendants did not reply to this email.

231. In an email dated July 30, 2024, Plaintiff advised Defendants that he found the only Prometric center that could provide him the accommodation for extended time. This testing center was approximately sixty miles away from Plaintiff's residence.

232. Rather than immediately permitting Plaintiff to sit for the exam at the accommodating center, Defendants further delayed Plaintiff's academic progress and access to the CBSE by moving Plaintiff to the September 2024 CBSE window.

233. Defendants also required Plaintiff to pay an additional $150 registration fee.

**K. September 2024 CBSE and Grant of Plaintiff's Appeal**

234. On September 25, 2024, Plaintiff sat for the CBSE with his approved accommodations.

235.    The September 25, 2024 CBSE was the first examination administered by Defendants during Plaintiff's enrollment that included Plaintiff's approved accommodations of extended testing time, a private room, and a reader.

236.    It also occurred approximately thirty-seven months after Plaintiff first submitted his neuropsychological evaluation to Defendants, requesting accommodations.

237.    In his appeal of the academic consequences arising from the September 25, 2024 CBSE, Plaintiff described Defendants' repeated failures to provide approved accommodations during examinations between August 2021 and September 2024.

238.    On October 22, 2024, Defendants granted Plaintiff's appeal

239.    By the time Plaintiff was finally permitted to take the CBSE with his approved accommodations, approximately sixteen months had elapsed since he should have taken the examination under Defendants' academic schedule.

## L.  Resulting Academic and Other Harm

240.    As a result of Defendants' conduct, Plaintiff incurred substantial educational debt, including approximately $268,872.69 in federal student loans.

241.    Plaintiff lost eligibility for Title IV federal student aid and remained academically delayed while Defendants failed to provide his approved accommodations.

242.    Plaintiff incurred additional expenses, including registration fees and the threatened cost of approximately $25,000 tuition to repeat the BSIC course.

243.    Defendants' conduct delayed Plaintiff's progression to the USMLE Step 1, clinical rotations, and other academic milestones by approximately sixteen months.

244.    Plaintiff alleges that the delays in receiving his approved accommodations prolonged his reliance on prescribed stimulant medication while attempting to compensate for the absence of those accommodations.

245.    Plaintiff also suffered emotional distress, anxiety, frustration, and stress associated with repeatedly attempting to secure the accommodations that Defendants had approved but repeatedly failed to provide.

**M. Defendants' Recruitment, Marketing and Business Practices**

**a.  Recruitment and Enrollment**

246.    Defendants marketed AUA through their website, social media platforms, email campaigns, radio advertising, digital streaming advertisements, and other nationwide marketing channels.

247.    Upon information and belief, Defendants purchased contact information for individuals who had taken the MCAT and targeted those individuals through telephone and email recruitment.    Defendants conducted telephone, email, and in-person recruitment efforts, including open-house events held throughout the United States, to induce prospective students to enroll.

248.    During the recruitment process, Defendants encouraged prospective students, including Plaintiff, to finance tuition and living expenses through Title IV federal student aid and private educational loans.

249.    Defendants utilize high-pressure sales tactics to persuade consumers to pay a $100 application fee and pay a $500 seat reservation fee in order to enroll at AUA.

250. Upon information and belief, AUA telemarketers are instructed to try to collect the reservation fee during the telemarketing call itself, even telling consumers that they have 48 hours to pay the fee or risk losing their spot in the school.

251. Upon information and belief, AUA telemarketers are compensated based on the number of consumers they convince to pay reservation fees for AUA and are also compensated based on the number of consumers who ultimately enroll as students.

b. **Material Omissions**

252. Defendants' Student Handbook provides that, after students execute enrollment agreements, Defendants reserve the right to amend academic rules, tuition, graduation requirements, and other policies at their sole discretion.

253. Defendants do not provide the Student Handbook to students until after they have enrolled and become contractually obligated to attend AUA.

254. Defendants do not publicly disclose student attrition rates or other information that would allow prospective students to evaluate the student retention and the likelihood of successfully completing AUA's medical program.

255. Defendants do not disclose that they use the CBSE as a mandatory progression requirement as opposed to how many United States medical schools use the examination, where it commonly serves as an assessment of readiness.

256. Defendants do not disclose that students who incurred substantial tuition obligations and federal student-loan debt could be required to repeat coursework, incur additional tuition expenses, or experience significant delays in academic progression if they were unable to satisfy Defendants' CBSE gatekeeping progression requirements.

257. Defendants do not publicly disclose the percentage of students who fail to satisfy Defendants' CBSE progression requirement on their first attempt.

258. Defendants do not publicly disclose the percentage of students required to repeat BSIC or other coursework as a result of failing Defendants' CBSE threshold.

259. Defendants do not publicly disclose the average length of academic delay experienced by students who do not satisfy Defendants' CBSE progression requirements.

260. Defendants do not publicly disclose the percentage of students whose progression to the USMLE Step 1, clinical rotations, or graduation is delayed because of Defendants' internal CBSE policies.

261. Defendants do not disclose that students requiring disability accommodations could experience additional delays in registering for, scheduling, and completing the CBSE because of Defendants' accommodation approval, permit-processing, and examination administration procedures.

262. Defendants do not disclose that students requiring disability accommodations would generally be subject to the same registration and testing deadlines as nondisabled students despite requiring additional time to obtain accommodation approvals, scheduling permits, and testing-center availability.

263. Because Defendants did not publicly disclose matriculation, attrition rates, and related student outcome data, Plaintiff was unable to independently evaluate the accuracy of Defendants' representations regarding student success, USMLE Step 1 performance, residency placement, and the academic consequences of Defendants' internal progression policies.

//

//

### c.  False Representations

264.   Before Plaintiff enrolled at AUA, Defendants, through their website, marketing materials, admissions  personnel, recruitment communications, and other promotional materials represented that AUA complied with the ADA and Section 504.

265.   Defendants represented that students with disabilities would receive reasonable accommodations and disability support consistent with the ADA and Section 504.

266.   Defendants represented that AUA would work with students with disabilities to secure and implement reasonable accommodations necessary for their participation in AUA's educational programs.

267.   Defendants represented favorable USMLE Step 1 performance and residency match outcomes as indicators of the quality and effectiveness of AUA's educational program.

268.   Plaintiff reviewed and reasonably relied upon Defendants' representations in deciding to enroll at AUA and to incur substantial tuition obligations and federal student-loan debt.

269.   Throughout Plaintiff's enrollment, Defendants exercised complete control over Plaintiff's disability accommodations, examination eligibility, academic progression, tuition obligations, enrollment status, and financial-aid eligibility.

270.   Plaintiff alleges that Defendants repeatedly approved accommodations they knew were necessary, repeatedly failed to implement those accommodations, and repeatedly relied upon the consequences of those failures to justify additional tuition, delayed progression, adverse academic actions, and ultimately Plaintiff' inability to timely complete his medical education.

//

//

44

## VI.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### SECTION 504 OF THE REHABILITATION ACT
### 29 U.S.C. § 794
### Against AUA and MEA

271.    Plaintiff repeats and realleges preceding paragraphs as though fully set forth herein.

272.    At all relevant times, Defendants received federal financial assistance, including participation in Title IV federal student financial aid programs, and were therefore subject to the requirements of Section 504.

273.    Plaintiff is an otherwise qualified individual with a disability within the meaning of Section 504.

274.    Defendants' educational programs, examinations, and related services constitute programs or activities within the meaning of Section 504.

275.    Section 504 required Defendants to provide Plaintiff meaningful access to their educational programs through reasonable modifications and appropriate auxiliary aids and services and prohibited discrimination on the basis of disability.

276.    Plaintiff requested reasonable accommodations, including extended testing time, a private testing room, and text-to-speech software and/or a live reader.  Defendants approved those accommodations but repeatedly failed to timely implement them.

277.    As alleged throughout this Complaint, Defendants denied Plaintiff meaningful access to their educational program by repeatedly failing to implement approved accommodations, failing to provide appropriate auxiliary aids and services, refusing reasonable modifications to policies governing examination scheduling and administration, and imposing academic consequences resulting from those failures.

45

278.    Defendants acted intentionally and with deliberate indifference to Plaintiff's federally protected rights.    They had actual knowledge of Plaintiff's disability, approved accommodations, repeated complaints, requests for assistance, appeals, and the barriers preventing Plaintiff from receiving equal access to Defendants' educational program.

279.    Defendants had actual notice on multiple occasions that Plaintiff had not received his approved accommodations before or during high-stakes examinations.    Rather than correcting those failures or restoring Plaintiff to the position he would have occupied absent the accommodation failures, Defendants repeatedly allowed the resulting academic consequences to remain in effect despite acknowledging, on multiple occasions, that Plaintiff's accommodations had been approved.

280.    Defendant MEA exercised operational control over the administrative functions governing Plaintiff's enrollment, disability accommodation implementation, examination eligibility, student records, and academic progression.    As alleged herein, MEA and Defendant Graham authorized, directed, ratified, or knowingly permitted the discriminatory conduct described throughout this Complaint and is therefore jointly liable for the violations of Section 504.

281.    As a direct and proximate result of Defendants' violations of Section 504, Plaintiff has suffered damages in an amount to be proven at trial, including economic damages, noneconomic damages, delayed educational progress, lost education and employment opportunities, and other damages according to proof.

//

//

//

**SECOND CAUSE OF ACTION**
**DISABILITY DISCRIMINATION UNDER TITLE III**
**OF THE AMERICANS WITH DISABILITIES ACT**
**42 U.S.C. §§ 12181-12189**
**Against AUA and MEA as Alleged Owners and Operators**

282.    Plaintiff repeats and realleges all preceding paragraphs in support of the claim.

283.    Defendant AUA is a private educational institution operating a place of public accommodation within the meaning of Title III of the ADA, 42 U.S.C. § 12181(7)(J). Upon information and belief, Defendant MEA operated or controlled AUA's educational program and administrative functions, including those governing disability accommodations, student records, examination eligibility, enrollment status, and academic progression, and is therefore subject to Title III.

284.    Plaintiff is an individual with a disability within the meaning of the ADA because his documented disabilities substantially limit one or more major life activities, including learning, reading, concentrating, thinking, and communicating.

285.    Title III prohibits discrimination on the basis of disability and requires reasonable modifications and appropriate auxiliary aids and services where necessary to afford equal access.

286.    Plaintiff requested reasonable accommodations, including extended testing time, a private testing room, and text-to-speech software and/or a live reader. Defendants approved those accommodations but repeatedly failed to timely implement them.

287.    As alleged throughout this Complaint, Defendants repeatedly failed to provide approved auxiliary aids and services, and reasonable modifications necessary to afford Plaintiff full and equal enjoyment of Defendants' educational program. Those failures delayed Plaintiff's academic progression and denied him educational opportunities available to students who did not require disability accommodations.

288. Defendants had actual knowledge of Plaintiff's disabilities and accommodation needs through medical documentation, neuropsychological evaluations, Plaintiff's repeated requests and Defendants' own accommodation approvals.   Providing the appropriate accommodations would not have fundamentally altered Defendants' educational program or imposed an undue burden.

289. By repeatedly failing to provide Plaintiff with approved auxiliary aids and services, failing to make reasonable modifications to policies, practices and procedures, and denying Plaintiff the full and equal enjoyment of Defendants' educational program because of his disability, Defendants violated Title III of the ADA and its implementing regulations.

290. Plaintiff is entitled to appropriate declaratory and injunctive relief, together with reasonable attorneys' fees, and costs pursuant to 42 U.S.C. § 12188.

## THIRD CAUSE OF ACTION
## NYSHRL DISABILITY DISCRIMINATION
## NYSHRL § 296(4)
### Against Institutional Defendants under § 296(4);
### Against Defendants Hunt and Graham, under § 296(6)

291. Plaintiff repeats and realleges all preceding paragraphs as though fully set forth herein.

292. At all times relevant, Institutional Defendants operated an educational institution subject to the New York State Human Rights Law, N.Y. Exec. Law § 296(4).

293. At all times relevant, Defendant Hunt acted as an employee of AUA, and actively aided, abetted, incited, compelled, or coerced the discriminatory acts against Plaintiff in violation of the New York State Human Rights Law, N.Y. Exec. Law § 296(6).

294. At all times relevant, Defendant Graham acted as an agent and/or employee of MEA, and actively aided, abetted, incited, compelled, or coerced the discriminatory acts against Plaintiff in violation of the New York State Human Rights Law, N.Y. Exec. Law § 296(6).

295. Plaintiff is an individual with a disability within the meaning of the NYSHRL and was otherwise qualified to participate in Defendants' educational program.

296. Plaintiff requested reasonable accommodations, including extended testing time, a private testing room, and text-to-speech software and/or a live reader. Defendants approved those accommodations but repeatedly failed to timely implement them.

297. As alleged throughout this Complaint, Defendants denied Plaintiff the full use and enjoyment of their educational facilities, advantages, and privileges by repeatedly failing to implement approved accommodations and by imposing academic and financial consequences resulting from those failures.

298. Defendant MEA exercised operational control over the policies and administrative practices giving rise to the discriminatory conduct alleged herein and is jointly liable under the NYSHRL.

299. Defendant Hunt personally participated in discriminatory conduct alleged herein and is individually liable under the NYSHRL.

300. Defendant Graham personally participated in, authorized, directed, and ratified the discriminatory conduct alleged herein and is individually liable under the NYSHRL.

301. Institutional Defendants' conduct constituted unlawful disability discrimination in violation of N.Y. Exec. Law § 296(4) and was undertaken knowingly, intentionally, and with reckless disregard for Plaintiff's rights.

302. Individual Defendants' conduct constituted unlawful disability discrimination in violation of N.Y. Exec. Law § 296(6) and was undertaken knowingly, intentionally, and with reckless disregard for Plaintiff's rights.

303. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff suffered damages as alleged throughout this Complaint.

304. Plaintiff is entitled to all relief available under the NYSHRL, including the compensatory damages, punitive damages to the extent permitted by law, attorneys' fees, costs, declaratory relief, and injunctive relief.

## FOURTH CAUSE OF ACTION
## BREACH OF CONTRACT
### Against AUA and MEA

305. Plaintiff repeats and realleges all preceding paragraphs as though fully set forth herein.

306. Plaintiff and Defendants entered into one or more binding contractual agreements, including Plaintiff's Registration Agreement dated July 23, 2020, Plaintiff's Admission letter dated August 25, 2020, the 2020 Student Handbook, published academic policies, tuition agreements, and other written policies governing Plaintiff's enrollment.

307. Plaintiff performed his contractual obligations by paying tuition and fees, completing the required coursework, complying with academic policies, and timely providing documentation supporting his disability accommodation requests.

308. The parties' contractual relationship required Defendants to "provide or arrange auxiliary aids and services for students with disabilities" as stated in the 2020 Student Handbook, and to abide by published Disability Accommodation Policy, published academic policies, and other governing institutional policies incorporated into Plaintiff's enrollment.

309.    Although Plaintiff's enrollment agreement was with AUA, MEA undertook and exercised responsibility for the administrative performance of contractual obligations relating to admissions, registration, financial aid, examination administration, and student services. MEA materially participated in and controlled the conduct constituting the breaches alleged herein.

310.    Defendants breached the Student Handbook and Disability Accommodation Policy by repeatedly failing to provide or arrange Plaintiff's approved disability accommodations, auxiliary aids, and equal access promised to qualified students with disabilities.

311.    Defendants further breached these policies by failing to administer examinations, accommodations procedures, and academic progression in accordance with their published policies, resulting in delayed access to required examinations and delayed academic progression.

312.    Defendants further breached the implied covenant of good faith and fair dealing inherent in every contract by exercising their contractual discretion in a manner that deprived Plaintiff of the benefits reasonably expected under the parties' agreement, including meaningful access to required examination and timely academic progression.

313.    As a direct and proximate result of Defendants' breaches, Plaintiff suffered damages as alleged throughout this Complaint.

314.    Plaintiff is entitled to recover all damages resulting from Defendants' breaches of contract in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION
## FRAUDULENT MISREPRESENTATION (COMMON LAW)

315.    Plaintiff repeats and realleges all preceding paragraphs as though fully set forth herein.

316. Before Plaintiff enrolled at AUA, Defendants, through the Student Handbook, Disability Accommodation Policy, website, admissions personnel, recruitment representatives, and enrollment communications, represented, among other things, that:

    a. AUA provided services to qualified students with disabilities as defined by law;

    b. Qualified students with disabilities had the right to participate equally in and benefit from the University's courses, programs, services, activities, and facilities.

    c. Qualified students with disabilities had the right to access reasonable accommodations and appropriate auxiliary aids and services on an equal basis;

    d. AUA would provide or arrange reasonable accommodations, academic adjustments, and auxiliary aids and services for qualified students with disabilities; and

    e. AUA would evaluate students based on their abilities rather than their disabilities.

317. At the time these representations were made, Defendants knew, or recklessly disregarded, that the representations were false or materially misleading because Defendants maintained policies, practices, and procedures inconsistent with those representations, including repeatedly failing to timely implement approved disability accommodations and maintaining academic progression policies that materially delayed Plaintiff's and other students' academic advancement through the program.

318. Defendants made these representations with the intent that prospective students, including Plaintiff, would rely upon them in deciding whether to enroll at AUA, incur substantial tuition obligations and federal student-loan debt.

319. As alleged throughout the Complaint, MEA exercised operational control over AUA's admissions, recruitment, marketing, financial aid administration, and related

administrative functions.  Upon information and belief, the representations and omissions alleged herein were made by or through AUA and MEA acting together, and MEA knew or recklessly disregarded that such representations and omissions were false or materially misleading.

320.    Plaintiff reasonably relied upon Defendants' representations in deciding to enroll at AUA, incur substantial educational debt, and continue his enrollment.

321.    Plaintiff would not have enrolled in AUA, or would have acted differently with respect to his enrollment and financial obligations, had Defendants truthfully represented their disability accommodation practices, academic progression policies, and student outcomes.

322.    As a direct and proximate result of Defendants' fraudulent misrepresentations, Plaintiff suffered damages as alleged throughout this Complaint.

323.    Defendants' conduct was intentional, willful, and undertaken with conscious disregard of Plaintiff's rights, entitling Plaintiff to all damages permitted by law.

## SIXTH CAUSE OF ACTION
## FRAUDULENT CONCEALMENT/FRAUD BY OMISSION (COMMON LAW)

324.    Plaintiff repeats and realleges all preceding paragraphs as though fully set forth herein.

325.    Before Plaintiff enrolled at AUA, Defendants possessed material information concerning their academic progression policies, disability accommodation practices, and student outcomes that would have been important to a reasonable prospective student deciding whether to enroll.

326.    Despite marketing their educational program to prospective students, Defendants failed to disclose material facts, including but not limited to:

a.      that the CBSE functioned as a mandatory progression requirement for eligibility to sit for the USMLE Step 1;

53

b.    that Defendants imposed a minimum CBSE performance threshold that Defendants knew materially affected progression;

c.    that students could be required to repeat coursework, incur additional tuition obligations, and experience significant academic delay if they did not satisfy Defendants' internal CBSE progression requirements;

d.    that students requiring disability accommodations could experience substantial delays in registering for, scheduling, and completing examinations because of Defendants' accommodation approval and examination administration procedures; and

e.    that Defendants did not publicly disclose material information regarding the CBSE performance outcomes, including the percentage of students who successfully satisfied the CBSE requirement and progressed to the USMLE Step 1, despite possessing such information and knowing that such information would be material to prospective students evaluating the likelihood of timely completion of the medical program.

327.    Defendants concealed these material facts, despite knowing that prospective students would consider the CBSE requirements, progression rates, and likelihood of timely advancement to the USMLE Step 1 as important facts in deciding whether to enroll and incur substantial tuition obligations and student-loan debt.

328.    Defendants possessed material information concerning their disability accommodation practices, academic progression requirements, and student outcomes that was peculiarly within their knowledge and not reasonably available to prospective students. Having elected to market their educational program and make affirmative representations concerning disability services and academic success, Defendants had a duty to disclose those material facts.

329.    Plaintiff reasonably relied upon Defendants' omissions in deciding to enroll at AUA and continue his enrollment.  Had Defendants disclosed these material facts, Plaintiff would not have enrolled at AUA, or would have acted differently with respect to his educational and financial obligations.

330.    As a direct and proximate result of Defendants' fraudulent concealment and omissions, Plaintiff suffered damages as alleged throughout this Complaint.

331.    Defendants' concealment was intentional, willful, and undertaken with conscious disregard of Plaintiff's rights, entitling Plaintiff to all damages permitted by law.

## SEVENTH CAUSE OF ACTION
## RETALIATION IN VIOLATION OF SECTION 504 OF THE REHABILITATION ACT
## (29 U.S.C. § 794 and 34 C.F.R. § 100.7(e), 104.61)

332.    Plaintiff repeats and realleges all preceding paragraphs of this Complaint as if fully set forth herein.

333.    Section 504 and its implementing regulations prohibit recipients of federal financial assistance from intimidating, threatening, coercing, or discriminating against an individual because that individual opposed disability discrimination, requested reasonable accommodations, or otherwise engaged in protected activity.

334.    Plaintiff engaged in protected activity by requesting reasonable accommodations, repeatedly objecting to Defendants' failures to implement approved accommodations, submitting complaints and appeals concerning disability discrimination, and asserting his rights under Section 504.

335.    Defendants knew of Plaintiff's protected activity because those requests, complaints, appeals, and communications were made directly to Defendants' administrators, including Defendant Hunt, Defendant Graham, and other AUA officials.

336.    After Plaintiff repeatedly requested accommodations and challenged Defendants' failures to implement them, Defendants subjected Plaintiff to materially adverse actions, including refusing to implement previously approved accommodations, denying equitable academic relief, requiring course repetition, delaying Plaintiff's academic progression, imposing additional tuition obligations, withholding student-status verification for the USMLE accommodation process, and otherwise imposing adverse academic consequences.

337.    As alleged throughout this Complaint, MEA exercised operational control over the registrar functions, enrollment status, examination eligibility, disability accommodation administration, and other administrative processes through which the retaliatory actions described herein were carried out.    Upon information and belief, MEA authorized, directed, ratified, or knowingly permitted those retaliatory actions and is liable for the retaliatory conduct alleged herein.

338.    Defendants took these materially adverse actions because of Plaintiff's protected activity, his requests for accommodations, complaints regarding disability discrimination, and efforts to enforce his rights under Section 504.

339.    As a direct and proximate result of Defendants' retaliatory conduct, Plaintiff suffered damages as alleged throughout this Complaint.

340.    Plaintiff is entitled to all relief available under Section 504, including compensatory damages, declaratory and injunctive relief as appropriate, reasonable attorneys' fees, litigation expenses, and costs.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants, and grant the following relief:

a. Award compensatory damages in an amount to be determined at trial;

b. Award punitive damages where permitted by law;

c. Award declaratory relief declaring that Defendants' conduct violated Plaintiff's rights under ADA, Section 504, the New York State Human Rights Law, and other applicable law;

d. Award appropriate injunctive and equitable relief requiring Defendants to cease discrimination on the basis of disability and to comply with applicable disability laws, including reasonable accommodation requirements, to the extent authorized by law;

e. Order Defendants to adopt, implement, and maintain policies and procedures , reasonably designed to ensure timely implementation of disability accommodations, including auxiliary aids and services, consistent with applicable federal and state law;

f. Award reasonable attorneys' fees, litigation expenses, and costs as authorized by applicable law;

g. Award prejudgment and post-judgment interest, as provided by law;

h. Grant Plaintiff leave to amend this Complaint as necessary if justice so requires; and

i. Award such other and further relief as the Court deems just and proper.

## VIII.    JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all issues so triable.

Valera Djaghouri, Pro Se
11332 Dona Pegita Drive
Studio City, CA 91604
(818) 257-3711

# EXHIBIT A

INDEX NO. 153386/2012
RECEIVED NYSCEF: 02/13/2017

FILED: NEW YORK COUNTY CLERK 02/13/2017 08:20 PM
NYSCEF DOC. NO. 215

## SERVICES AGREEMENT

THIS SERVICES AGREEMENT (this "Agreement") is made as of March 19, 2012 by and between AMERICAN UNIVERSITY OF ANTIGUA INC. a corporation organized under the laws of Antigua and Barbuda, ("AUA") and MANIPAL EDUCATION AMERICAS, LLC., a New York limited liability company ("MEA").

### Recitals

AUA is an institution of higher education located on the island of Antigua that, inter alia, offers medical degree programs through both classroom and clinical instruction that prepare students to sit for the U.S. Medical Licensing Examination ("USMLE") and provide a foundation for students' postgraduate specialty training in the United States (the Business"). AUA wishes to obtain from MEA, and MEA is willing to provide to AUA, certain services relating to the Business on the terms and conditions set forth in this agreement.

### Agreement

AUA and MEA hereby agree as follows:

1. Provision of Services.

   (a)     Services. During the term of this agreement, and subject to the terms and conditions of this agreement, MEA shall perform the admissions, clinical administration, financial aid servicing, legal, management, bursarial, registrarial, accounting and other services described on Schedule A, together with such additional services as AUA may reasonable request from time to time (collectively, the "Services").

   (b)     Facilities. MEA shall use all reasonable efforts to provide the services of qualified personnel, and the use of sufficient and proper equipment and facilities, for the provision of the Services to AUA. If MEA is not reasonably able to perform the requested Services in a timely manner, then (i) MEA shall promptly notify AUA of such inability and of the reasons for such inability and (ii) the parties shall agree upon the time and manner of the Services to be provided.

   (c)     Licenses and Permits. MEA shall be fully responsible for obtaining and complying with all governmental licenses, permits, and similar requirements with respect to its provision of the Services.

1

(d)    Insurance. MEA shall maintain usual and customary general liability and other business insurance policies covering its provision of the services.

2. Compensation.

(a)    Amount. AUA shall pay for each month during the term of this agreement a fee equal to MEA's costs incurred during each said month for providing the Services hereunder including an allocation of costs for all applicable time and overhead attributable to MEA'S employees plus four (4%) percent except that, for Executive Management Services provided by MEA, the fee shall include an allocation of costs for all applicable time and overhead attributable to MEA's executives plus twelve and one half (12 ½%) percent. Said fees shall be paid on the fifteenth (15th) day of each subsequent month or by such time both MEA/AUA agree on.

Annually, AUA shall subject the fee structure paid hereunder to MEA in the preceding fiscal year to be audited by an independent auditor using a "Net Cost Plus" ("NCP") analysis. In the event that the audit results in a finding that either of the fees paid for all services provided by MEA other than Executive Management Services or the fees paid for Executive Management Services during the audited year were in excess of the highest limit of the interquartile range of three-year weighted average NCP'S established by comparable service providers, AUA shall be entitled to claw back from MEA the difference(s) between the fees paid and the such amount as would have been paid as fees hereunder if said fees were calculated by use of the highest limit of the said three-year interquartile range of NCP's established by comparable service providers for the audited year.

(b)    Transfer Pricing. The parties agree that the compensation to be paid pursuant to this Section 2 is intended to satisfy the standard prescribed by U.S. Treasury Regulation §1.482-2(b).   If it is subsequently discovered that such pricing does not produce an arm's length result, the parties agree to make, on or before the due date (including extensions) of MEA's U.S. federal income tax return for the tax year of the erroneously-priced Services, whatever compensating adjustments are necessary in order to achieve an arm's length result under U.S. Treasury Regulation §1.482-2(b).   Such adjustments may be made in the form of an actual cash payment or an adjustment to the books and records of the parties for the year of the transaction.

3.    Warranty; Limitation of Liability. MEA shall provide the Services under this Agreement in a professional and workmanlike manner and in accordance with applicable industry standards.   EXCEPT AS PROVIDED IN THE PRECEDING SENTENCE, MEA MAKES NO WARRANTY, EXPRESS OR IMPLIED, WITH RESPECT TO THE SERVICES. Notwithstanding anything contained in this Agreement to the contrary, neither party shall have any liability to the other party under this Agreement for any loss of profits or special or consequential damages, even if such party is apprised of the possibility of such damages.

4.    Indemnification. Each of MEA and AUA agrees to indemnify the other party and such other party's officers, agents, contractors, and employees and hold them

2

harmless from and against any and all claims, actions, damages, liabilities and expenses (including reasonable attorneys' fees) resulting from the gross negligence or intentional malfeasance of such party, its officers, agents, contractors or employees.

5.    Records and Confidential Information.

(a)    Redelivery of Records. All memoranda, notes, reports, records or other documents made or compiled by MEA, or made available to MEA, concerning the Business ·shall be ADA's property and shall be delivered to AUA on the termination of this Agreement or at any other reasonable time upon the request of AUA.

(b)    Confidentiality. MEA shall keep secret and retain in strictest confidence, and shall not use for the benefit of itself or others, all confidential or non-public proprietary knowledge or information pertaining to AUA or the Business that MEA learns during the course of providing Services under this Agreement, and AUA shall keep secret and retain in strictest confidence, and shall not use for the benefit of itself or others, any confidential or non-public proprietary knowledge or information pertaining to MEA that AUA learns during the course of being provided Services under this Agreement. This obligation shall not apply to, and the parties shall have no confidentiality obligations with respect to, any information that: (i) is or becomes public knowledge without breach of this covenant, (ii) was known to the party prior to the disclosure of such information to the party, (iii) is available to third parties who are entitled to disclose such information to the party, or (iv) is independently developed by the party without reference to or reliance upon any information that is required to be kept confidential hereunder. The confidentiality obligations of the parties under this Section 5(b) shall not apply to the extent that the disclosure of information otherwise determined to be confidential is required by applicable law; provided, that prior to disclosing such confidential information, the party making the disclosure must notify the other party thereof, which notice will include the basis upon which the disclosing party believes the information is required to be disclosed.

(c)    Injunctive Relief; Survival.    Each party consents and agrees that any violation of the provisions of this Section 5 would result in irreparable harm to the other party and, therefore, in addition to any other remedies such other party may have, such other party shall be entitled to apply to any court of competent jurisdiction to enjoin the party from committing or continuing any violation of the provision of this Section 5. The provisions of this Section 5 shall survive the termination of this Agreement.

6.    Term. The term of this Agreement shall commence on the date hereof and shall continue until terminated by either party upon not less than 60 days prior written notice.

7.    Miscellaneous.

(a)    Notices. All notices which are required or may be given pursuant to the terms of this Agreement shall be sufficient in all respects if given in writing and (x) delivered personally or by reputable overnight courier or (y) mailed by registered,

3

certified or express mail (postage prepaid), or (z) sent by facsimile or other electronic transmission, to the parties at the following addresses and numbers or such other address or numbers as either party shall designate by notice in writing to the other in accordance with this Agreement:

If to MEA, to:

Manipal Education Americas, LLC.
1 Battery Park Plaza, 33rd Floor
New York, NY 10004
Attention: Chief Financial Officer
Telephone: 212-661-8899

If to AUA, to:

American University of Antigua, Inc.
Jabberwock Road
St. John's, Antigua
Attention: Vice President of Administration
Telephone: 268-484-8900

All such notices shall be deemed to have been given when received.

(b)    Amendment; Waiver.    No amendment, waiver or modification   or supplement of any provision of this Agreement, and no consent to any departure from such provision, shall be effective unless in writing and signed by both parties and designated as an amendment or, in the case of a waiver or consent, by the party granting it. Any of the terms and conditions of this Agreement may be waived at any time by the party entitled to the benefit of this Agreement, but such waiver shall not affect or impair the right of the waiving party to require observance, performance or satisfaction either of that term or condition as it applies on a subsequent occasion or of any other term or condition of this Agreement. The failure or delay of either party to exercise any right under this Agreement shall not be construed as a waiver of that right.

(c)    Force Majeure. Neither party to this Agreement shall be responsible for failure or delay in performance under this Agreement, other than failure or delay in payment of money, when such failure or delay is due to a force majeure event, including (i) compliance with any act, order, demand or request of any government or governmental authority, agency or instrumentality; (ii) labor disputes, difficulties or work stoppages or slowdowns of any kind; (iii) hurricane, earthquake and other natural disasters or fires; (iv) war, rebellion, or civil disorder; or (v) any other cause beyond the reasonable control of the non-performing party. Performance of this Agreement shall be suspended during such time as any force majeure event continues.

4

A party that is relieved of any obligation or duty imposed on it by this suspended Agreement pursuant to the terms of this Section 7(c) shall take all reasonable and practical measures and shall make diligent efforts to remove or cause the removal of the cause preventing its performance as soon as practicable.

(d)     Severability.  If any portion of this Agreement should be adjudged illegal or unenforceable, the remainder of this Agreement shall continue to be enforceable.

(e)     Entire Agreement.  This Agreement constitutes the entire agreement between the parties.  Any oral or other written understandings relating to the subject matter of this Agreement are no longer effective and are superseded by this Agreement.  In the event of conflict between the terms, conditions and provisions of this Agreement and any purchase order, invoice or acknowledgment or other document issued by either party, the terms, conditions and provisions of this Agreement shall prevail.

(f)     Relationship of the Parties.  The parties to this Agreement are independent contractors and neither party is an employee, agent, partner or joint venturer of the other. Without limiting the foregoing, neither party hereto shall have the authority to enter into contracts on behalf of, or otherwise legally bind, the other party.  Under no circumstances shall any of the employees of a party to this Agreement be deemed to be employees of the other party for any purpose.

(g)     Governing Law: Jurisdiction.  This Agreement and the legal relations among the parties hereto shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and performed entirely in such State.  In the event of any litigation arising out of this Agreement, the parties hereto agree that jurisdiction and venue shall rest in the federal and state courts of the State of New York.

(h)     Binding Effect. This Agreement shall be binding upon and inure solely to the benefit of the parties to this Agreement and their successors and permitted assigns. Nothing in this Agreement, express or implied, is intended to or shall confer upon any other person or entity any legal or equitable right, benefit or remedy of any nature whatsoever.

(i)     Assignability.  Neither party may assign this Agreement or any right granted under it, nor delegate any duty imposed by it, without the prior written consent of the other party.

(j)     Counterparts.  This Agreement may be executed in one or more counterparts, and by different parties to this Agreement in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement.

5

INDEX NO. 153386/2012
RECEIVED NYSCEF: 02/13/2017

FILED: NEW YORK COUNTY CLERK 02/13/2017 08:20 PM
NYSCEF DOC. NO. 215

(k)    Interpretation.    The language in all parts of this Agreement shall in all cases be construed as a whole according to its fair meaning, neither strictly for nor against either party.  The rule of construction that a document is to be construed more strictly against the person who prepared it shall not apply to this Agreement, it being agreed that representatives of both parties have participated in its preparation.

(l)    Rules of Construction.    For purposes of this Agreement (including all schedules and amendments), unless the context otherwise requires, (i) all terms defined herein include the plural as well as the singular, (ii) the masculine, feminine or neuter gender shall be deemed to include the others whenever the context so requires, and (iii) all accounting terms used herein but not otherwise defined herein shall have the meaning given to them under generally- accepted accounting principles, consistently applied.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "but not limited to."  "Or" is disjunctive but not necessarily exclusive.  Reference to Sections are, unless otherwise specified, to Sections of this Agreement.  Words such as "herein," "hereinafter," "hereof," "hereto," "hereby" and "hereunder" refer to this Agreement and to the Schedules, taken as a whole, unless the context requires otherwise.  References herein to any agreement or other instrument shall, unless the context otherwise requires, be deemed references to the same as it may from time to time be changed, amended or extended in accordance with its terms. Headings are inserted in this Agreement for convenience only and are not to be given any legal effect and shall not affect in any way the meaning or interpretation of the provisions of this Agreement.

Execution

IN WITNESS WHEREOF, the parties have duly executed and delivered this Services
Agreement as of the date first written above.

AMERICAN UNIVERSITY OF ANTIGUA
COLLEGE OF MEDICINE, INC.

By: _____
Name: Neal Simon
Title: Pres

MANIPAL EDUCATION AMERICAS, LLC.

By: _____
Name: Leonard Sebastian
Title: Sr. V. P.

6

INDEX NO. 153386/2012
RECEIVED NYSCEF: 02/13/2017

FILED: NEW YORK COUNTY CLERK 02/13/2017 08:20 PM
NYSCEF DOC. NO. 215

## SCHEDULE A
### Services

1.    <u>Admissions</u>: MEA will provide admissions and student services for all AUA programs (including AUA Medical School and the AUA-KMC Twinning Program).    Such admissions services include:

(a)    Preparing and distributing brochures, newsletters and other marketing materials to prospective students.

(b)    Responding to inquiries and providing applications and information packages to prospective students who have expressed an interest in one or more AUA programs.

(c)    Hosting receptions and other events for prospective students.

(d)    Conducting phone and in-person interviews of prospective students.

(e)    Reviewing applications and selecting successful candidates for further review by the Faculty Admissions committee.

(f)    Assisting students in coordinating their relocation to Antigua.

(g)    Developing/executing marketing and branding campaigns for all programs.

2.    <u>Registrar</u>: MEA will act as registrar for AUA programs including:

(a)    Maintaining student academic records.

(b)    Assisting students with scheduling of clinical rotations.

(c)    Setting the academic calendar.

3.    <u>Clinical Instruction</u>: MEA will coordinate and supervise the clinical portion of all AUA programs in the United States. Such clinical training services include:

(a)    Identifying, evaluating and selecting teaching hospitals in the United States where AUA students will obtain their clinical training.

(b)    Identifying, evaluating and selecting physicians to be shadowed by students in AUA's clinical training programs.

(c)    Monitoring of the teaching hospitals and physicians involved in ADA's clinical training programs for quality assurance.

(d)    Providing Clinical Chairmen to oversee ADA's clinical training programs and also provide an Academic Provost.

7

INDEX NO. 153386/2012

RECEIVED NYSCEF: 02/13/2017

FILED: NEW YORK COUNTY CLERK 02/13/2017 08:20 PM

NYSCEF DOC. NO. 215

8

INDEX NO. 153386/2012
RECEIVED NYSCEF: 02/13/2017

(e)    Assisting students in coordinating their relocation to the United States and assisting with housing relocation in the United States for students in ADA's clinical training programs.

4.    <u>Financial Aid</u>: MEA will provide financial aid services, including:

(a)    Loan counseling for students.

(b)    Preparing, distributing and reviewing financial aid applications.

(c)    Selecting financial aid, academic scholarship and housing scholarship recipients and determining aid levels.

(d)    Loan processing for students.

(e)    Identify and maintain lender relationships

5.    <u>Accounting</u>: MEA will provide accounting services, including:

(a)    Acting as bursar for AUA as its accounts receivable function.

(b)    Providing daily business processing support and financial reporting.

(c)    Managing payroll and compensation for full-time and part-time employees and consultants with respect to (a) AUA's Basic Sciences Faculty (pre-med and semesters 1 through 4) and AUA's Research and Development staff in Antigua, and (b) clinical sciences faculty, clinical chairman and other personnel in the United States.

(d)    Manage other expenses as requested including but not limited to rent and student housing payments, insurance and other contract payments.

(e)    Assist in the Management of facilities development and construction

(f)    Collections.

(g)    Assisting AUA with adherence to accounting and tax requirements.

6.    <u>Information Technology Services</u>. Purchasing and maintaining AUA'S organizational IT infrastructure.

7.    <u>Purchasing</u>. Coordinating and facilitating procurement for AUA'S organization.

8.    <u>Office Administration</u>. Providing clerical support and other non-academic office-related services in the United States.

9.    <u>Legal Compliance</u>. Obtaining business licenses and permits, accreditation and other governmental and third party approvals necessary to AUA'S business.

9

FILED: NEW YORK COUNTY CLERK 02/13/2017 08:20 PM
NYSCEF DOC. NO. 215

INDEX NO. 153386/2012
RECEIVED NYSCEF: 02/13/2017

10.    Insurance. Obtaining insurance with respect to AUA's programs.

11.    Travel.  Coordinating faculty travel between AUA's various locations and the United States.

12.    Other. Providing such other services and AUA and MEA may agree from time to time.

FILED: NEW YORK COUNTY CLERK 02/13/2017 08:20 PM
NYSCEF DOC. NO. 215

# EXHIBIT B



**COLLEGE OF MEDICINE**

August 25, 2020

Mr. Valera Djaghouri
11332 Dona Pegita Dr.
Studio City, California 91604

Dear Mr. Djaghouri:

Congratulations! On behalf of the AUA College of Medicine community, I am pleased to offer you admission to the Fall 2020 incoming class.

You were selected among a group of extraordinarily talented and accomplished individuals. As such, your admission to AUA College of Medicine is evidence of our confidence in your potential as well as recognition of your personal qualities and scholastic achievements. Our community is enriched by the strengths of each member and we eagerly look forward to your participation in and contribution to our academic and social endeavors.

I would like to offer my sincere congratulations on this important step toward realizing your goal of becoming a doctor. You and your family should be proud of this accomplishment. You are about to begin your quest to join one of the most respected and trusted professions. AUA College of Medicine is committed to providing you with an education that will prepare you to become a competent and caring physician.

We look forward to providing assistance and guidance as you enroll in AUA College of Medicine.

Sincerely,

James M. Rice, RhD
Associate Dean of Admissions
Associate Dean of Student Affairs
Professor, Department of Behavioral Science & Neuroscience

Manipal Education Americas, LLC Representative for American University of Antigua
1 Battery Park Plaza, 33rd Floor, New York, NY 10004
1 (888) AUA-UMED | www.auamed.org